■ GREGORY PELZER, Respondent, v TRANSEL ELEVATOR & ELECTRIC INC., Appellant, et al., Defendants. [839 NYS2d 84]—

Order, Supreme Court, Bronx County (Stanley Green, J.), entered April 21, 2006, which, to the extent appealed from, denied appellant's motion for summary judgment dismissing the complaint, affirmed, without costs.

Because the doctrine of collateral estoppel is applicable to the quasi-judicial determinations of administrative agencies such as the Unemployment Insurance Appeal Board, such determinations become binding in a subsequent legal action for purposes of issue preclusion (*Ryan v New York Tel. Co.*, 62 NY2d 494, 499 [1984]). However, "[s]ince administrative agencies are normally charged with making determinations based on unique, and often times complex, statutes and regulations which apply specifically to them, care must be taken in identifying the precise issue necessarily decided in the first proceeding and comparing it to the issue involved in the second proceeding" (*Matter of Engel v Calgon Corp.*, 114 AD2d 108, 110 [1986], *affd* 69 NY2d 753 [1987]).

Here, the only issue decided in the unemployment proceeding was whether or not plaintiff had committed misconduct within the meaning of Labor Law § 593 (3) in connection with his employment by defendant Olmstead Properties, the managing agent of the building. The Administrative Law Judge found that plaintiff had disobeyed the building superintendent's direct orders and that such disobedience, when he knew or should have known that his actions would jeopardize his employment, constituted misconduct. Contrary to appellant's contentions, the issues of sole proximate cause and assumption of risk were not before the Administrative Law Judge and were not decided in the administrative proceeding.

We reject the dissenters' conclusion that, as a matter of law, plaintiff was the sole proximate cause of his injuries. While it was hazardous for plaintiff to climb in and out of the stalled elevator cab, plaintiff was in communication, directly or by radio, with the building's superintendent (Bill Bent), who was standing next to appellant's employee (Semyon Genyuk) when he restored power to the elevator, causing it to move and injure plaintiff. Thus, both were aware of plaintiff's activities, and the extent to which his actions and those of appellant's employee contributed to the injuries sustained presents a question of fact for resolution by a jury under principles of comparative negligence.

The doctrine of primary assumption of the risk, embraced by the dissent, is inapplicable to the circumstances herein. The evidence shows that Bent directed plaintiff to get back into the

elevator, and moments later the power was turned back on, resulting in plaintiff's injuries. Bent testified: " 'Gregory, where are you?' He says I'm outside. I says 'Why are you outside?' I told you to stay in the back of the elevator with the two guys from Time Warner, to stay there and stay in the back until we get the car moving."

Bent was also asked if he told plaintiff to get back in the elevator, to which Bent responded, "Yes." The next question was how long after he yelled to plaintiff to get back in the elevator did Genyuk turn the power back on. Bent responded, "It was only moments." Once again, as Bent was communicating with plaintiff, Bent was standing next to Genyuk, who heard the communication yet proceeded to turn the power back on, causing the elevator to move and crush plaintiff.

Bent's testimony was inconsistent and contradictory throughout his examination, and the portions recited by the dissent merely confirm the existence of factual issues. Bent initially stated that he directed plaintiff to get back into the elevator but later denied it. Asked several times if he knew whether plaintiff was in or out of the elevator's cab while he was communicating with him, Bent variously answered both "yes" and "no." At the least, his testimony raises factual issues as to whether he directed plaintiff to get back into the elevator and whether Genyuk was negligent in restoring the power without first ascertaining if the elevator was clear. The dissent selectively cites the portions of Bent's testimony that support appellant's cause while completely disregarding those passages that are damaging to plaintiff's position.

It should be noted that there were two other individuals in the elevator cab, and no person in defendants' employ attempted to ascertain where they were before putting the power switch back on. The two individuals testified that they did not hear anyone telling them to remain in the elevator.

Extensive and unrestricted application of the doctrine of primary assumption of the risk to tort cases generally represents a throwback to the former doctrine of contributory negligence, wherein a plaintiff's own negligence barred recovery from the defendant. However, even if the facts of this matter were examined under contributory negligence principles, a factual question would remain as to whether appellant's employee could have prevented injury under the doctrine of the last clear chance (see New York City Tr. Auth. v Morris J. Eisen, P.C., 276 AD2d 78, 83 [2000]), and summary judgment would still be inappropriate.

Finally, in light of the evidence that the building superinten-

dent knew plaintiff was climbing in and out of the stalled elevator but did not know where he was at the moment power was restored, it has not been demonstrated that plaintiff's actions constitute "an unforeseeable superseding event that absolves defendants of liability" (cf. *Boltax v Joy Day Camp*, 67 NY2d 617, 620 [1986]). Concur—Tom, J.P., Mazzarelli and Buckley, JJ.

Friedman and McGuire, JJ., dissent in a memorandum by McGuire, J., as follows: Plaintiff was a passenger in a freight elevator that stalled above the first floor of the building in which plaintiff worked as a porter. Using a walkie-talkie, plaintiff notified the building's superintendent, Bent, who was employed by defendant 5421 Equities Co. (5421 Equities), the owner of the premises, of the situation. Bent and Genyuk, an employee of Transel Elevator & Electric Inc. (Transel), the company that maintained the elevators in the building, went to the motor room of the freight elevator, which was located in the building's basement. While Genyuk attempted to ascertain what the problem was with the elevator, Bent yelled to the passengers therein—plaintiff and two visitors in the building—letting them know that the elevator was being repaired. According to Bent, plaintiff got out of the elevator—apparently by climbing out of a trapdoor in the ceiling of the elevator—and walked onto the street adjacent to the shaft in which the elevator was stationed. Bent testified that plaintiff got in and out of the elevator multiple times before the accident occurred, and that Bent had repeatedly screamed at plaintiff to remain in the elevator and "to stop running back and forth out of the elevator." When service to the elevator was restored, plaintiff, who was outside of the elevator at the time, was struck by the elevator; neither Bent nor Genyuk knew that plaintiff was outside of the elevator at the time.

Plaintiff commenced this action against Olmstead Properties Inc., the management company of the premises, 5421 Equities, and Transel. Transel moved for summary judgment dismissing the complaint and all other claims as against it, asserting, among other things, that plaintiff's actions were, in effect, a superseding cause of his injuries and that he assumed the risk of injury by climbing out of the elevator. Supreme Court denied the motion and Transel appealed.

In my view, Transel's motion should have been granted. Notwithstanding that he was told both that efforts were being made to restore service and that he should remain in the elevator, plaintiff chose to climb out of the elevator. Moreover, plaintiff was not in danger of injury while in the stalled elevator. Notably, the other two occupants of the elevator, citing

safety concerns, refused to attempt to climb out of the elevator. Accordingly, plaintiff's actions superseded Transel's conduct and terminated its liability for plaintiff's injuries (see *Egan v A.J. Constr. Corp.*, 94 NY2d 839 [1999]; *Weingarten v Windsor Owners Corp.*, 5 AD3d 674 [2004]; *Antonik v New York City Hous. Auth.*, 235 AD2d 248 [1997], *lv denied* 89 NY2d 813 [1997]; cf. *Wiggins v City of New York*, 1 AD3d 116 [2003]; *Humbach v Goldstein*, 255 AD2d 420 [1998]).

According to the majority, summary judgment in Transel's favor is unwarranted because Bent knew that plaintiff was climbing in and out of the elevator, and therefore plaintiff's presence outside of the elevator at the time service was restored was not unforeseeable. In light of his conduct, plaintiff's presence outside of the elevator was not unforeseeable; to the contrary, it was foreseeable. However, that plaintiff's presence outside of the elevator was foreseeable is, by itself, legally unremarkable. After all, if plaintiff was on the street at the time power was restored, the elevator would have posed no danger to him. The appropriate question, rather, is whether plaintiff's presence on top of the elevator at the time power was restored was foreseeable. Bent had repeatedly instructed plaintiff to stop climbing in and out of the elevator, and to remain where he was, i.e., in the elevator or on the street. Bent's last admonitions came "minutes" before service was restored and he therefore had no reason to believe that, at the time service was restored, plaintiff would be in the midst of climbing back into or out of the elevator.

Plaintiff intimates that Bent had instructed plaintiff to get back into the elevator after he had climbed out. A fair reading of Bent's testimony, however, does not support that assertion. Bent made it clear that he instructed plaintiff to stop getting in and out of the elevator, and to remain where he was, i.e., in the elevator or on the street. The relevant testimony is as follows:

"Q: On the day in question, prior to [plaintiff] being injured, did [plaintiff] ever crawl out of that elevator?

"A: Yes, he did.

"Q: How long before he was injured—was that once or more than once?

"A: More than once.

"Q: How many times, to your knowledge, did he come out of the elevator that day?

"A: I don't know. He was coming in and out of the elevator and I wasn't even aware of it until one point.

"Q: Was it twice that he came out of the elevator?

"A: It was probably three or four times. . . .

"Q: How do you know he was out of the elevator?

"A: How do I know he was out of the elevator? Because I could see him and hear him on the street screaming.

"Q: He went out on the street?

"A: Yes, he went out on the street, he came back in. . . .

"Q: Your conclusion that he was on the street is based on exclusively your perception of where the sound of his voice was emanating from; do I have that right?

"A: [Plaintiff] was out on the street and when he walked back in, he was still screaming and I told him '[Plaintiff], where are you?' He says I'm outside. I says 'Why are you outside? I told you to stay in the back of the elevator with the [other] two guys . . . , to stay there and stay in the back until we get the car moving.' Because it was too close an area. We didn't want anybody squeezing through there . . . .

"Q: Before the accident happened, did you have any knowledge that [plaintiff] was out of the [elevator]?

"A: Before the accident?

"Q: Yes.

"A: Yes. I told him distinctly to stop running back and forth out of the elevator. . . .

"Q: In the language that you already gave us on the record? You said—what did you tell him, to get back in the elevator?

"A: Yes.

"Q: How long after you yelled at [plaintiff] to get back in the elevator did [Genyuk restore] the power [to the elevator]?

"A: It was only moments.

"Q: Just so I got it accurate on the record, just so I got it accurate, you yelled at [plaintiff] to get back in the elevator and moments later, [Genyuk] turned on the power; is that the way it happened?

"A: No.

"Q: Tell me how it happened.

"A: When I realized—I was telling him to stop running in and out of the elevator. Now he winds up, he goes—

"Q: When you said that to him, was he out of the elevator or in the elevator, as far as you knew?

"A: When I said that to him, I think he was out of the elevator.

"Q: From the point you said that to him, how much time

transpired before [Genyuk] turned on the power? How much time? Was it a minute, was it 30 seconds, was it five seconds, how much time?

"A: It's hard to—

"Q: Was it less than a minute?

"A: I think it was minutes. When I screamed at him about running in and out of the elevator, at that point, I told him to stay where he was because now I already knew he was running in and out of the elevator. Now I'm telling him 'You're in the elevator, stay in the elevator.'

"Q: Wait a minute. You believe he was out of the elevator when you yelled at him, right, is that accurate?

"A: Look the guy was in and out. He was in and out.

"Q: Where did you think he was when you yelled at him? Was he in the elevator or out of the elevator when you yelled at him?

"A: When I yelled at him, I think he was in the elevator. I think when I was screaming at him and was cursing at him, that he was in the elevator. . . .

"Q: Do you know, as you sit here today, whether [plaintiff] was either in or out when you yelled at him or are you just guessing?

"A: When I yelled at him, he was outside the elevator because I was telling him 'Stay the hell where you are.'

"Q: You didn't tell him to get back in the elevator?

"A: No. The last thing I wanted or need[ed] is somebody else in the elevator. My objection to the whole thing is if this elevator was stuck over here, I don't care, you walk out, you open the doors to take people out through an opening like this, it's like you don't know what's going to happen with the elevator. This is why we insisted that you stay in the back of the elevator, in the back of the elevator and be quiet."

Even assuming, arguendo, that a triable issue of fact did exist regarding whether plaintiff's conduct constituted a superseding cause of his injuries, summary judgment in Transel's favor would be appropriate on the ground that plaintiff assumed the risk of injury by climbing out the elevator. "The doctrine of primary assumption of the risk [may] relieve[ ] . . . defendants of any duty of care that they may have owed the plaintiff, even though the plaintiff's injury did not result from a leisure or sporting activity" (*Sy v Kopet*, 18 AD3d 463, 463 [2005], *lv denied* 6 NY3d 710 [2006]; *see Belloro v Chicoma*, 8 AD3d 598 [2004]; *Westerville v Cornell Univ.*, 291 AD2d 447 [2002]; *Bereswill v National Basketball Assn.*, 279 AD2d 292 [2001]; *see also*

*Shaw v Lieb*, 40 AD3d 740 [2d Dept 2007]). Plaintiff was an experienced porter who, based on the admonishments of Bent, was aware that it was dangerous to climb out of the elevator. Nevertheless, plaintiff voluntarily climbed out of the elevator. Thus, the danger that caused plaintiff's injuries, i.e., being struck by a moving elevator, was known, apparent or reasonably foreseeable to plaintiff, and the doctrine of primary assumption of risk bars recovery against Transel (*see Sy v Kopet, supra*; *Belloro v Chicoma, supra*; *Westerville v Cornell Univ., supra*).

Accordingly, I would reverse the order, grant Transel's motion and dismiss the complaint as against it.